IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CAROLYN KLEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:12-cv-956-MEF |
| | ) | (WO - Do Not Publish) |
| L-3 COMMUNICATIONS | ) | |
| CORPORATION, ARMY FLEET | ) | |
| SUPPORT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carolyn Klein ("Plaintiff" or "Klein") brings this action against Defendants

L-3 Communications Corporation ("L-3") and Army Fleet Support, LLC ("Army Fleet")

(collectively, "Defendants") as a result of her termination from Army Fleet. This cause is

now before the Court on Defendants' Motion for Summary Judgment (Doc. #19) filed on

August 16, 2013. Having carefully considered the parties' arguments and evidentiary

submissions, the applicable case law, and the record as a whole, the Court finds that the

motion is due to be GRANTED.

## I. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the claims in this action under 28

U.S.C. §§ 1331 and 1343. The parties do not contest personal jurisdiction or venue, and the

Court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Id.* at 322–23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a district court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the non-moving party has responded to the motion for summary judgment, the district court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

### III.  FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion.  The submissions of the parties, when viewed in the light most favorable to the non-moving party, establish the following material facts:

**A.     The Parties**

**1.     Army Fleet and L-3**

Army Fleet maintains aircraft for the military at Fort Rucker in Dale County, Alabama.  Army Fleet is a wholly owned subsidiary of L-3, an international company.[1] Army Fleet and L-3 maintain separate books and records, separate payrolls, separate computer systems, and separate physical offices.  Army Fleet and L-3 do not employ the same employees, directors, or officers.  L-3 does not actively participate in or control the day-to-day operations of Army Fleet.

However, as Army Fleet's parent company, L-3 does issue and provide Army Fleet employees with a handbook.  Also, while Army Fleet maintains many of its own policies, Army Fleet employees are subject to L-3 policies, including those on workplace respect,

---

[1]  Lesa Hatfield, a human resources generalist for Army Fleet, describes Army Fleet as "standalone" from L-3.  "We do our own thing."  (Doc. #21-3.)

harassment, equal employment opportunities, and ethics.  Army Fleet adopts and follows these policies in an effort to be more "uniform," and L-3 trains Army Fleet employees on these workplace policies.  L-3 has no involvement with the hiring, disciplining, or firing decisions concerning Army Fleet employees unless an ethics issue is involved.  In those cases, L-3 is consulted regarding the ethical issue prior to an employment decision being made.  Legal counsel for L-3 and Mitch Moore ("Moore"), an L-3 Vice President, are invited to and periodically participate in Army Fleet committee meetings regarding ethics complaints made at Army Fleet.  L-3 is also involved with corrective action requests and preventative action requests for Army Fleet, issues guidelines and provides final approval of Army Fleet's recommendations as to the amount of merit increases for Army Fleet employees, and issues a benefits questionnaire to new Army Fleet hires or those changing their benefits.  In this case, the L-3 legal department was consulted prior to Klein's termination for the purpose of ensuring that her lay off complied with any WARN[2] Act requirements.

### 2.    Klein

Klein is a certified public accountant.  She was hired by Army Fleet on October 30, 2006, and was laid off on August 27, 2012, effective September 7, 2012, as part of a reduction in force.  Prior to Army Fleet, Klein worked 15 years for the Air Force in an

---

[2] The WARN Act refers to the Worker Adjustment and Retraining Notification Act, which provides certain protections to workers in the event of plant closings and mass layoffs.  *See* 29 U.S.C. § 2101, *et seq.*

administrative capacity and 18 years for the Defense Contract Audit Agency performing financial audits of military maintenance contractors.

Klein's chain of command was within Army Fleet.  She reported to and was supervised by Army Fleet employees and was assigned work by Army Fleet employees. Klein was paid by Army Fleet.  Klein had contact with L-3 personnel "very rarely."  In fact, she recalled meeting with only three L-3 employees on a handful of occasions to discuss a complaint she had made about questionable labor charges and accounting irregularities in Army Fleet's Finance and Accounting Department.  Apart from this, Klein's only other contact with L-3 employees was "[m]aybe just a meeting, passing in the hallway, or an introduction."  (Doc. #21-1.)

**B.    Klein's Employment with Army Fleet**

**1.    Employment History**

Klein was hired by Army Fleet as a Contracts Coordinator on October 30, 2006.  She reported to Free Lee and later John Hamlin ("Hamlin") and Dave Pruitt ("Pruitt") in the Finance and Accounting Department.  Klein worked as a Contracts Coordinator until a reduction in force took place in the Finance and Accounting Department.  She was then transferred to Internal Auditor in the Quality Department on November 14, 2007.  As an Internal Auditor, Klein primarily performed financial, accounting, and human resources audits, although she was also tasked with aviation-related audits.  Her supervisor changed from Pruitt to Michael Olive ("Olive").

On March 6, 2009, while an Internal Auditor, Klein submitted a corrective action

5

request to Olive concerning questionable labor charges and accounting irregularities she believed existed in Pruitt's Finance and Accounting Department.  A few weeks later, on March 22, 2009, Klein was promoted to a Senior Internal Auditor position in the Quality Department.  The job description for Senior Internal Auditor consisted primarily of financial/accounting audits, as opposed to aviation/maintenance-related audits.  Still, as a member of the Quality Department, Klein was expected to perform aviation-related audits, as were all auditors in the Quality Department.  Olive, who remained Klein's supervisor after her reclassification to Senior Internal Auditor, knew nothing of the job description for a Senior Internal Auditor.  Indeed, it appears that Olive was most familiar with the job requirements of the Quality Auditor/Monitor, whose primary function is to  supervise and audit activities and workers engaged in the inspection and testing of aircraft equipment, parts, supplies, and materials, in addition to performing other various auditing-related tasks.

On April 28, 2009, Klein joined in the grievance of another employee about the bullying behavior of Pruitt between 2007 and 2009.  Klein's complaint about Pruitt was investigated, and at the conclusion of the investigation, Pruitt was moved to another office in Mississippi by June 25, 2009.

In May 2009, Klein again voiced her concerns to Olive about questionable labor charges and accounting irregularities in Pruitt's department.  An internal investigation was conducted regarding Klein's complaints.  On June 26 and 30, 2009,[3] Klein met with an

---

[3]  Klein also met with two other L-3 employees regarding this complaint, but it is unclear exactly when this meeting or meetings took place.

6

internal auditor from L-3, and it was suggested during the June 26th meeting that Klein's supervisor change from Olive to Hamlin (who was Army Fleet's general manager at the time) to gain a level of independency.  This change never happened.  Instead, on June 30, 2009, Klein was called into a meeting with Olive and Tom Allen, another Army Fleet employee, and was told that her job description (but not her job title) was changing.  Specifically, Klein learned that she would no longer be performing financial/accounting audits but would instead be performing quality/maintenance-type audits.  Klein was shown a list of duties she would be performing, and she complained that the most important and enjoyable aspects of her job were being taken away.  Klein claims that she also learned during this meeting that her financial auditing duties were given to another employee,[4] but these duties were actually outsourced to a third-party accounting firm.  To help her perform these aviation-related duties, Klein completed an extensive training course and was certified as a AS9100 Lead Auditor in Aerospace Standards in November 2009, qualifying her to perform avaiation-related audits.

In May 2010, Klein received a 1.5% merit pay increase from $75,116 to $76,243.76 annually.  This increase was based on Klein's 2010 performance based management ("PBM") review score and her salary at the time relative to the salary midpoint for her

---

[4]  Klein's briefing on this argument is somewhat contradictory.  While Klein claims at one point in her brief that her financial auditing duties were given to another Army Fleet employee, she appears to subsequently concede that these duties were indeed outsourced.  (*See* Doc. #28, p. 9) ("[T]he SOX audits were outsourced long before Plaintiff was ever selected for the senior internal auditor position.").  After reviewing the record, it appears to the Court that the audit supposedly given to another employee was already on Army Fleet's auditing schedule for 2009 and that the remainder of the financial auditing duties were outsourced.

position ($70,600).  Klein claims that this low increase was unfair and retaliatory (it appears she expected closer to a 3% increase), as it was based on a poor performance review that resulted from Olive grading her against the expectations for a Quality Auditor/Monitor, as opposed to a Senior Internal Auditor, which was the position she held at the time.

Klein again voiced her concerns about questionable labor charges and accounting irregularities in September 2010.  Klein filed a written "management" grievance on September 9, 2010.  Army Fleet investigated the grievance.  During the investigation, Klein complained that she was being retaliated against for reporting the accounting irregularities and that she was no longer assigned meaningful work as a result.  Klein also complained about her low merit increase in May 2010.  During the investigation, Olive admitted that Klein's areas of focus are human resources, information systems, and procurement, and that she is limited due to her lack of an aviation background.  The investigation concluded with a recommendation that Olive place greater emphasis on communicating with Klein and that he begin a comprehensive field training program with her.

After Klein's financial/accounting auditing duties were removed in June 2009, her duties were more align with the duties of a Quality Auditor/Monitor, rather than a Senior Internal Auditor, the position Klein still held, although all auditors in the Quality Department were expected to perform aviation-related audits.  Minimum qualifications for the Quality Auditor/Monitor position include: (1) a high school diploma or equivalent; (2) successful completion of formal training by the U.S. Army or Armed Forces equivalent, or training courses conducted by industry or civilian institutions; (3) a minimum of five years experience

in aviation maintenance and a valid FAA Airframe and Powerplant Certificate; (4) a minimum of three years quality control experience; (5) a thorough working knowledge of aircraft systems, maintenance publications, basic tools, special tools, and equipment; (6) the ability to read and interpret technical data, blueprints, and instructions; (7) knowledge of corrosion detection, prevention and treatment; (8) familiarity with flight line operations and safety requirements; and (9) an ability to use, with accuracy, all measuring, testing, and diagnostic equipment normally associated with aircraft maintenance.  Prior to joining Army Fleet, Klein had not performed aircraft maintenance audits, and she did not consider herself qualified to perform aircraft maintenance or other aviation-related audits because she knew nothing about aircrafts or aircraft maintenance.   While Klein did obtain a AS9100 certification for Lead Auditor, there is no dispute that she did not meet the minimum qualifications of the Quality Auditor/Monitor position, at least as described in the job description.

Klein expressed to Olive on multiple occasions that she was unqualified to perform aircraft maintenance audits and that she feared a loss of life or property could result if she did, but she was nevertheless asked to perform aircraft maintenance and aviation-related audits.  While Klein would continue to perform audits she felt she was qualified to perform as a Senior Internal Auditor, such as contracts, information systems, and human resources,[5]

---

[5] Klein claims that, after late June 2009, these audits were either cancelled or assigned to other auditors.

she refused to perform maintenance or aviation audits, citing her lack of qualifications.[6]

On June 22, 2011, while Klein was still a Senior Internal Auditor, she received a performance evaluation from Olive that scored her as 47–not fully meeting standards.  That evaluation, however, was based on the Quality Auditor/Monitor position, as opposed to the Senior Internal Auditor position Klein still held at the time.  Klein was unaware of the job expectations for the Quality Auditor/Monitor position until she was provided the written goals for that position a few days before her 2011 evaluation.  Klein objected to being evaluated based on the Quality Auditor/Monitor position, and she submitted a formal response to Olive regarding the unfairness of her evaluation.  As a result, Olive revised the evaluation and changed Klein's rating to 69–fully meets standards.  At the time of Klein's initial 2011 evaluation and subsequent revision, Olive had not seen the job expectations for the Senior Internal Auditor position and had not provided any goals to Klein for that particular position.

Some time in July 2011, a position was posted for Principal Internal Compliance Auditor, which was within Army Fleet's Finance and Accounting Department.  The job description for this position was very similar, but not identical, to the job description for Klein's Senior Internal Auditor position.  Klein met the minimum qualifications for the Principal Internal Compliance Auditor job and expressed interest in it, but she was not

---

[6]   Olive, on the other hand, testified that Klein would refuse to perform assigned maintenance audits (as well as other types of audits) for a variety of reasons, ranging from not having her safety glasses or her boots, to it being allergy season, to her having to do the audit at night or having to walk to the hangers in the rain.  (Doc. #33-1.)

considered for the position.  Around that same time, Klein's position with Army Fleet was reclassified from Senior Internal Auditor to Quality Auditor/Monitor[7] to align her classification to the rest of the Quality Department.[8]  Klein expressed her concern to Olive that she was not qualified to perform the type of maintenance and aviation audits required of this position and that she did not desire to be transferred to this position.

In January 2012, Klein was assigned to be the quality auditor for the Modification Work Order ("MWO") project.  As part of this project, Klein was required to audit the maintenance process for certain aircraft.  Klein, who had a AS9100 Lead Auditor certification at the time, followed along with several quality auditors to familiarize herself with the project.[9]  That training notwithstanding, Klein still refused to perform the audit, citing her lack of qualifications.  Olive explained to Klein that she was only to audit the maintenance process, not the maintenance itself,[10] but Klein still would not perform this

---

[7]  Klein learned of this reclassification in June 2011, but it did not become effective until July 11, 2011.

[8]  More specifically, Army Fleet contends that Klein would often refuse to perform assigned aviation and maintenance-related audits on the basis that it did not fall within her job description as a Senior Internal Auditor, despite the fact that this position was within the Quality Department, where all auditors were expected to perform aviation-related audits.  Thus, Army Fleet contends that to preclude Klein from relying on her technical classification as Senior Internal Auditor (as opposed to Quality Auditor/Monitor) to refuse to perform assigned aviation and maintenance-related audits, it involuntarily reclassified her position to Quality Auditor/Monitor.

[9]  With respect to the training given to Klein, Olive testified: "[E]ven though I'd explained to her how to do it, what to do it, other people had offered to show it to her, I'd sat down at her desk and showed it to her, she still didn't feel like she could do it."  (Doc. #33-1.)

[10]  Klein claims, however, that performing the MWO would have required her to actually evaluate the specific maintenance being performed on the aircraft, rather than simply determining whether the documentation regarding the performance of certain maintenance was in order.  For

project or other aviation-related audits.  As a result, on May 14, 2012, Klein was issued a written letter of counseling for insubordination.  During the counseling session, Klein again expressed her belief that she was not qualified to perform aviation-related audits and asked that she be reassigned to the procedures group.  The written counseling reflects that Klein was reassigned to the procedures group, and she worked in this position a few days before beginning medical leave in May 2012.  However, Klein's position was never officially reclassified to the procedures group before her termination in September 2012.  Instead, Klein remained officially classified as a Quality Auditor/Monitor at the time of her termination.

### 2.    Termination

In 2012, Army Fleet reduced its flight hours at Ft. Rucker.  As a result, some time between May and August 2012, Olive received a directive from Army Fleet to reduce his department by one person.  Olive stacked and ranked his employees based on their most recent performance score (2011) and his personal opinion of performance.  Klein ranked at the bottom of all quality auditors in Olive's department.  As such, Klein was selected for termination as part of the reduction in force.

### 3.    FMLA

Klein was involved in a boating accident in May 2012 during which she suffered a

---

example, Klein testified that performing the MWO would have required her to determine whether proper maintenance had been performed in order for the red-X (no flight) status of an aircraft to be removed and the aircraft be put back into flight status.  Klein did not believe she had the proper training to make such a critical determination.

spinal fracture.  Army Fleet learned of Klein's injury immediately and knew that she would need medical leave.  However, Army Fleet did not place Klein on leave under the Family and Medical Leave Act ("FMLA"), did not discuss FMLA leave with her, and did not provide her with FMLA paperwork.  Instead, Klein took 12 weeks of non-FMLA leave beginning May 31, 2012, and drew short-term disability during this time.  No one at Army Fleet or L-3 ever stated or suggested that Klein's leave for her back injury would cause her to lose her job.  In fact, Klein had taken similar non-FMLA leave in the past for a medical condition and was returned to work and accommodated.

The decision to terminate Klein as part of a reduction in force was made while she was out on leave for her back injury.  Klein was released to return to work with no restrictions on August 27, 2012, and within hours of returning to work, she received her formal notification that she was being laid off as part of a reduction in force effective September 7, 2012.

**D.    Procedural History**

Klein filed her first EEOC Charge of Discrimination on July 11, 2011.  Therein, she alleges claims for sex and age[11] discrimination as well as retaliation.  Klein's retaliation claim was based on (1) her 2011 performance evaluation against the expectations of a Quality Auditor/Monitor when she was a Senior Internal Auditor; (2) her reclassification to Quality Auditor/Monitor when she was not qualified for the position after she complained about

---

[11]  Klein did not pursue her age claims before the EEOC and has likewise not pursued any such claims in this litigation.

Pruitt; (3) advertising her Senior Internal Auditor position as "vacant" when she still held the position;[12] and (4) her lower than expected merit increase in 2010.  This Charge was against Army Fleet only, and Klein identified the dates of discrimination as June 22, 2011, through July 7, 2011.[13]

On July 26, 2012, Klein filed her second supplemental Charge with the EEOC, alleging additional sex discrimination and retaliation based on her May 14, 2012 written counseling.  Again, this Charge was against Army Fleet only and identified the dates of discrimination as April 1, 2012, though May 14, 2012.

On November 3, 2012, Klein filed her third supplemental Charge with the EEOC claiming sex discrimination and retaliation.  Klein identified the alleged retaliatory acts as follows: (1) reassigning her job duties in the Summer of 2009; (2) her May 2010 pay increase; (3) advertising her position as "vacant" in May 2011 when she still held the position; (4) her poor 2011 performance review; (5) her involuntary transfer to the Quality Auditor/Monitor position in July 2011; (6) being given few job assignments after this transfer; (7) her May 14, 2012 written counseling; and (8) her termination.  Klein also asserted for the first time that this Charge was a "continuing action," and she named both

---

[12] This position actually advertised was Principal Internal Compliance Auditor, which Klein claims was essentially the same as her Senior Internal Auditor position, although the job tasks for these two positions were similar but not identical.

[13]  In November 2011, Klein also submitted a written complaint with the Department of Defense Office of Investigator General about her auditing concerns and being asked to perform aircraft maintenance audits in what she perceived to be retaliation for expressing her auditing concerns.

Army Fleet and L-3 as her employers.

Klein was issued a notice of right to sue on her request on November 8, 2012.  Klein filed her complaint on October 31, 2012, asserting claims for interference and retaliation under the FMLA (Count One); sex discrimination under Title VII (Count Two); retaliatory hostile work environment under Title VII (Count Three); retaliation under the False Claims Act (Count Four); and Intentional Infliction of Emotional Distress (Count Five).  Defendants seek summary judgment on all of Klein's claims.

## IV.  DISCUSSION

### A.    Claims Against L-3

The Court must first address whether L-3 can be held liable for Klein's claims in this case.  L-3 argues that it cannot because it is merely the parent company of Army Fleet and never employed Klein.  Klein, on the other hand, argues that L-3 was her employer under either the "single employer" or "joint employer" theory, and, therefore, L-3's liability is appropriate.

Courts typically consider a parent company to be a separate corporate entity from its wholly owned subsidiary.  *See, e.g., Perry v. Household Retail Servs., Inc.*, 953 F. Supp. 1378, 1381 (N.D. Ala. 1996).  Indeed, "[t]he concept that a corporation is a legal entity existing separate and apart from its shareholders is well-settled law[,]" and courts are cautioned not to lightly disregard that concept.  *Id.*  "The mere existence of a parent-subsidiary relationship is not enough to impose liability on the parent." *Wood v. S. Bell Tel. & Tel. Co.*, 725 F. Supp. 1244, 1249 (N.D. Ga. 1989).  Rather, at least in the employment

context, courts have imposed liability on a parent company for its subsidiary's conduct if the parent company qualified as the employee's employer under either the single or joint employer theory.[14]

A single employer theory "involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise[.]" *Long v. Aronov Realty Mgmt., Inc.*, 645 F. Supp. 2d 1008, 1029 (M.D. Ala. 2009) (internal quotations and citations omitted). The showing necessary to warrant a single employer finding is a high level of integration with respect to ownership and control. *See id.* at 1030; *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). The relevant factors courts are to consider are: (1) the interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Id.* Ultimately, the single employer analysis

---

[14] In this Circuit, the single and joint employer theories have been widely recognized in the Title VII context and have also been recognized in the FMLA context. *See, e.g., Llampallas*, 163 F.3d 1236, 1244–45 (Title VII); *Virgo*, 30 F.3d 1350, 1361 (Title VII); *McKenzie*, 834 F.2d 930, 933 (Title VII); 29 C.F.R. § 825.104(c)(2) (discussing "integrated employer" and "joint employment" tests in FMLA context); *Cardinale v. S. Homes of Polk Cnty., Inc.*, 310 Fed. App'x 311, 312 (11th Cir. 2009) (discussing FMLA's integrated employer and joint employment regulation). However, neither party has discussed whether such theories are applicable to Klein's retaliation claim under the False Claims Act. A handful of courts have applied or at least discussed the potential application of the single/joint employer theories in the context of claims under the False Claims Act. *See Campion v. N.E. Utilities*, 598 F. Supp. 2d 638, 654–55 (M.D. Pa. 2009); *United States of Am. v. Hackensack Univ. Med. Center*, 2005 WL 3542471, at *1 (D.N.J. Dec. 23, 2005), *aff'd* 495 F.3d 103 (3rd Cir. 2007); *Thompson v. Quorum Health Res., LLC*, 2007 WL 2815972, at *3 (W.D. Ky. Sept. 27, 2007). While no bright-line rule has presented itself to the Court through its research, a decision on this issue is unnecessary at this point, as Klein has failed to create a genuine dispute that L-3 qualified as her employer under either the single or joint employer theory, as discussed in detail below. Moreover, a decision as to whether the single or joint employer theory applies to Klein's outrage claim is similarly unnecessary, as Klein has conceded that summary judgment is due to be granted to Defendants on that claim.

"'concentrate[s] on the degree of control an entity has over the [allegedly liable conduct]' on which the suit is based." *Long,* 645 F. Supp. 2d at 1030 (quoting *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244–45 (11th Cir. 1998)).

The Court finds that L-3 does not qualify as Klein's employer under the single employer theory.   First, the evidence does not demonstrate a sufficient interrelation of operations.   Courts are to consider several indicia of interrelatedness: "(1) combined accounting records; (2) combined bank accounts; (3) combined lines of credits; (4) combined payroll preparation; (5) combined switchboards; (6) combined telephone numbers; and (7) combined offices." *Walker v. Boys and Girls Club of Am.*, 38 F. Supp. 2d 1326, 1331 (M.D. Ala. 1999).   In this case, the undisputed evidence shows that L-3 and Army Fleet maintain separate financial books, separate accounting records, and a separate payroll.   There is also insufficient evidence of combined lines of credit, combined offices, combined bank accounts, or combined switchboards or telephone numbers between the two.

Second, the evidence does not demonstrate centralized control of labor relations between L-3 and Army Fleet.   The type of control required to meet this criterion "is not potential control, bur rather actual and active control of day-to-day labor practices." *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 727 (N.D. Ala. 1981).   Klein's chain of command was always within Army Fleet.   Klein never reported to anyone at L-3.   Instead, she was supervised by Army Fleet employees, received her work assignments from Army Fleet employees, and was paid by Army Fleet.   Klein only recalled meeting with three L-3 employees on a handful of occasions over her almost six years of employment with Army

17

Fleet.  In other words, the evidence before the Court does not demonstrate that L-3 exerted the type of active control over the daily operations of Army Fleet to justify a finding of centrally controlled labor operations between the two.

The Court notes that Klein places significant emphasis on the fact that L-3 issued policies to Army Fleet, particularly ethics policies, and provided some guidance to Army Fleet with respect to merit pay increases, employee training, employee benefits, and corrective action reports.  Klein points to this as evidence that L-3 actively controlled the day-to-day operations of Army Fleet.  This type of involvement, however, is insufficient to establish centralized control of labor.  Parent corporations are "expected—indeed, required—to exert some control over its subsidiary" through normal incidents and involvement of ownership, such as choosing direction and setting general policies.  *See In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F. Supp. 1447, 1452 (N.D. Ala. 1995) (citing *Anderson v. Abbott*, 321 U.S. 349, 362 (1944)).  While there is no dispute that L-3 was involved with Army Fleet's operations through issuing various policies to Army Fleet, training employees, providing benefit questionnaires and red-lined reports, and being involved in other aspects of Army Fleet's business, such involvement did not exceed the bounds of control any parent company is expected to exercise and maintain over its subsidiary.[15]

_____

[15]  *Compare Llampallas*, 163 F.3d at 1245 (finding no single employer when one company was not involved in the adverse employment action, had no interaction with the other company's employees, and made no decisions that affected the terms and conditions of the other company's employees); *and Walker*, 38 F. Supp. 2d at 1326 (finding no centralized control of labor operations even though national organization provided insurance and pension benefits for local organization's

Klein also relies on the fact that the L-3 legal department was consulted before her termination as evidence of centralized control of labor operations between L-3 and Army Fleet.  Both the single and joint employer theories "concentrate on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." *Llampallas*, 163 F.3d 1236, 1244–45 (11th Cir. 1998).  In this case, the evidence reveals that Army Fleet consulted L-3's legal department on Klein's termination to ensure that it complied with Army Fleet's obligations under the WARN Act.  However, the final decision to terminate Klein as part of the reduction in force was made by Olive, an Army Fleet employee, and all of the other retaliatory acts of which Klein complains were carried about by Army Fleet employees—not L-3.  In sum, the evidence fails to show that L-3 exerted the type of day-to-day control over Army Fleet such that the Court could find that labor operations were centralized between the two.  *See Clifford v. Patterson Companies, Inc.*,

---

employees, published job vacancies for local organization, provided job descriptions and performance review charts for local organization, and employee of national organization was involved in termination meeting of local organization's employee), *with McKenzie*, 834 F.2d at 933–43 (reversing district court's granting of summary judgment on single employer theory when evidence showed that both companies were founded and owned by the same family, one company owned the majority of the other's stock, both companies shared the same president, who also controlled personnel management for both companies and issued payroll checks from the same company, the companies advertised as "twins in service," and the plaintiff worked for both companies), *and Thornton v. Mercantile Stores Co., Inc.*, 13 F. Supp. 2d 1282, 1291–92 (M.D. Ala. 1998) (denying summary judgment on single employer when parent company handled the wholly-owned subsidiary's banking, paid vendors supplying products to the subsidiary, retained control over the subsidiary's yearly operating budget, made all hiring, firing, transfer, and promotion decisions for the subsidiary's senior employees, maintained significant contact with the subsidiary's human resources managers and significant control over the subsidiary's employment practices, distributed a handbook to the subsidiary, provided centralized "risk management," operated centralized management information services for the subsidiary, managed all the subsidiary's benefit programs, provided extensive training for subsidiary employees, and most senior officials with the parent company also held senior management positions with the subsidiary).

2009 WL 3852447, at *10 (N.D. Ill. Nov. 18, 2009) (finding that preparation of EEOC position statement by parent company's in-house counsel is not sufficient evidence to find a joint employment relationship absent evidence that parent company controlled daily activities of plaintiff or directed his work; all this showed was that parent company "provided administrative and legal assistance" to its subsidiary).

Finally, while there is no dispute that Army Fleet is a wholly owned subsidiary of L-3, and thus, there is common ownership between the two, the evidence does not reveal common management or common financial control between L-3 and Army Fleet. "Cases treating two separate corporate entities as a single employer have placed heavy emphasis on the existence of common directors and officers." *Fike*, 514 F. Supp. at 727 (citations omitted). Here, there is no evidence that Army Fleet and L-3 shared directors, officers, or other employees. There is also insufficient evidence of common financial control between the two, as Army Fleet and L-3 kept separate financial books, separate accounting records, and a separate payroll. Weighing all these factors together, Klein has failed to create a genuine dispute as to whether L-3 and Army Fleet qualify as her "single employer."

Klein has also failed to create a genuine dispute as to whether L-3 and Army Fleet qualify as "joint employers" in this case. The Eleventh Circuit has held that the basis for finding a joint employer relationship "is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of employees who are employed by the other employer." *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1360 (11th Cir. 1994). In

other words, to be considered a joint employer, an entity must exercise sufficient control over the terms and conditions of a plaintiff's employment. *Id.* at 1360. Courts usually make such a determination by analyzing: (1) the means and manner of the plaintiff's work performance; (2) the terms, conditions, or privileges of the plaintiff's employment; and (3) the plaintiff's compensation. *See Kaiser v. Trofholz Tech., Inc.*, 935 F. Supp. 2d 1286, 1293 (M.D. Ala. 2013) (citing *Llampallas*, 163 F.3d at 1245).

In this case, the evidence shows that Klein's chain of command was always within Army Fleet. She reported to Army Fleet employees, was supervised by Army Fleet employees, was assigned work by Army Fleet employees, and was paid by Army Fleet. In fact, Klein had contact with L-3 personnel "very rarely," meeting with only three L-3 employees on a handful of occasions during her almost six years of employment there. Olive, an Army Fleet employee, administered Klein's performance reviews, recommended her pay increases, and issued disciplinary actions. Although L-3's legal department might have been consulted regarding Klein's termination to ensure that it complied with WARN Act requirements, Olive made the final decision to terminate Klein as part of the reduction in force. Based on this evidence, the Court cannot conclude that L-3 exercised sufficient control over Klein to qualify as her "joint employer."

Rather, in the Court's opinion, the undisputed evidence supports the conclusion that Army Fleet was Klein's employer, not L-3. Because all of Klein's claims in this case are predicated on the existence of an employer-employee relationship, her claims against L-3 cannot survive as a matter of law. Summary judgment is, therefore, due to be GRANTED

to L-3 on all of Klein's claims.

**B.**     **Sex Discrimination and Outrage Claims**

Counts Two and Five of Klein's complaint assert claims against Army Fleet for sex discrimination under Title VII and intentional infliction of emotional distress (otherwise known as the tort of outrage) under Alabama law.  In response to Defendants' motion for summary judgment, Klein concedes that there is insufficient evidence to support these claims, and the Court agrees.  Therefore, summary judgment is due to be GRANTED to Army Fleet on Counts Two and Five of Klein's complaint.

C.     **Retaliation Claims**

Counts Three and Four of Klein's complaint assert retaliation claims against Army Fleet.  (Doc. #1.)  First, Klein claims that Army Fleet subjected her to a hostile work environment in retaliation for her complaints about discriminatory and harassing conduct made unlawful by Title VII.  Klein brings this claim under Title VII.  Second, Klein claims that Army Fleet retaliated against her for complaining about accounting irregularities in violation of the False Claims Act ("FCA").  Both of these claims fail as a matter of law.

1.     **Title VII**

From Klein's complaint and her response in opposition to summary judgment, it is clear that her Title VII claim is not a run-of-the-mill retaliation claim, but rather is a retaliatory hostile work environment claim.  In *Gowski v. Peake*, the Eleventh Circuit recognized a separate and distinct cause of action for retaliatory hostile work environment. 682 F.3d 1299, 1312 (11th Cir. 2012).  To succeed on this claim, the Court must determine whether a reasonable jury could find that Army Fleet subjected Klein to a hostile work environment in retaliation for complaining about conduct made unlawful by Title VII and for filing charges with the EEOC.  To answer this question in the affirmative, a jury must be able to conclude that the actions complained of were sufficiently severe or pervasive to alter the terms and conditions of Klein's employment.  *Id.*

Klein points to essentially eight retaliatory acts in support of her claim:[16] (1) the

---

[16]    Army Fleet notes in its brief in support of its motion for summary judgment that Klein is also relying on her hearing inappropriate language in the workplace as a retaliatory act.  (Doc.

elimination of her finance and accounting auditing duties in June 2009; (2) a failure to receive work assignments beginning in June 2009; (3) her May 2010 merit pay increase, which she believed was too small; (4) her performance evaluation based on the goals of a Quality Auditor/Monitor instead of Senior Internal Auditor in June 2011, which was ultimately adjusted upward; (5) advertising her position as vacant when she still held it; (6) her reclassification from Senior Internal Auditor to Quality Auditor/Monitor in July 2011 when she was not qualified for the Quality Auditor/Monitor position; (7) her May 14, 2012 written counseling; and (8) her termination.  However, Klein has failed to show how these acts were objectively or subjectively so severe and pervasive that they created a retaliatory hostile working environment.

The requirement that the harassment be "severe and pervasive" contains both an objective and subject component.  *See id.*  Thus, to be actionable, the behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceived to be abusive.  *Id.*  In evaluating the objective severity of the harassment, the Court looks at the totality of the circumstances and considers, among other things: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job

---

#20.) However, after reviewing Klein's brief in opposition to summary judgment, it does not appear that she is indeed relying on the use of such language to support her retaliatory hostile work environment claim.  (Doc. #28.)

performance." *Id.* (internal quotations omitted).

First, the acts of which Klein complains were discrete acts that, alone, cannot form the basis of a hostile work environment claim. *Id.* (citing *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 970 (11th Cir. 2008)).  Still, even treating these acts as part of a hostile work environment, Klein has failed to meet her prima facie burden as to her retaliatory hostile work environment claim.  In her opposition brief, Klein focuses the entirety of her argument on the timeliness of certain alleged retaliatory acts and how they should be considered as part of an ongoing retaliatory hostile work environment.  Timeliness aside,[17] the Court cannot help but note that Klein spends no time arguing the merits of her retaliatory hostile work environment claim or pointing the Court to specific evidence that would create a triable issue as to whether the retaliatory acts of which she complains were objectively and subjectively severe and pervasive such that she could meet her prima facie burden.  Still, even if she had, the Court is not persuaded, after reviewing the evidence and drawing all inferences therefrom in Klein's favor, that the retaliatory acts of which she complains were so severe and pervasive to sustain a retaliatory hostile work environment claim.  Accordingly, summary judgment is GRANTED to Army Fleet on Klein's Title VII retaliatory hostile work environment claim

---

[17]  Because the Court finds that Klein's Title VII retaliatory hostile work environment and FCA retaliation claims fail as a matter of law, irrespective of any timeliness issues, it need not discuss what retaliatory acts are or are not time-barred.

2.     **FCA**

Klein's complaint also asserts a claim for retaliation for reporting accounting irregularities in violation of § 3730(h) of the FCA, which is the "whistleblower" provision. The burden shifting framework for FCA retaliation claims is similar to the Title VII framework of *McDonnell Douglas Corp. v. Green*, except that the FCA has an additional element: the employer must be covered by the FCA.  *See Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1316–17 (M.D. Ala. 1999).  Here, Army Fleet concedes that it is covered by the FCA.  Therefore, Klein's FCA claim will be analyzed under the same framework as a Title VII retaliation claim.

Here, even assuming, without deciding, that Klein has met her prima facie burden (*i.e.*, demonstrated that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there is an inference of causation between the protected activity and the adverse action), her claim fails because she has not created a triable issue on whether Army Fleet's legitimate, non-discriminatory reason for her termination—a reduction in force— was, in reality, a pretext for a retaliatory motive.  *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997); *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  The only discussion of Klein's FCA claim in her opposition brief is:

> The False Claims Act similarly prohibits retaliation against someone who makes a complaint of accounting irregularities both internally to AFS and externally to the Office of Inspector General for the U.S. Army.  As a proximate result of her reporta [sic], she suffered damages and filed her lawsuit within the three year limitations period of the statute.

(Doc. #28.)  Klein makes no argument as to the merits of her claim and points the Court to

26

no specific evidence demonstrating that she met her prima facie burden or that she created

a triable issue as to whether Army Fleet's articulated non-discriminatory reason for her

termination is merely a pretext for a retaliatory motive.  In sum, the Court finds that the

evidence is not sufficient to create a triable issue as to Klein's FCA claim, and, therefore,

summary judgment is GRANTED to Army Fleet on that claim.

**D.     FMLA Claim**

Count One of Klein's complaint asserts a claim against Army Fleet for unlawful

discrimination and retaliation against Klein for "taking federally protected medical leave

under the FMLA and for refusing to restore her to her position and terminating [Klein] on

the day she returned from such leave."  (Doc. #1.)  Nowhere in the complaint does Klein

attempt to assert an interference claim based on Army Fleet's purported failure to comply

with FMLA notice provisions.  (Doc. #1.)  Indeed, Count One of the complaint does not

make a single reference to any of the FMLA's notice provisions.  (Doc. #1.)  Nor does the

facts section of Klein's complaint.  (Doc. #1.)  Rather, the sole factual allegation on which

Klein's FMLA claim is based, as alleged in the complaint, is:

> Effective May 31, 2012, the Plaintiff was approved for Family Medical Leave
> because of a serious health condition.  On the day that she returned to work
> after FMLA leave, August 27, 2012, she was informed that her position would
> be eliminated effective September 7, 2012 and that she would be terminated
> at that time.

(Doc. #1, ¶ 18.)[18]

In response to summary judgment, Klein now raises for the first time an FMLA interference claim based on Army Fleet's failure to comply with certain FMLA notice provisions. However, as Army Fleet correctly notes, such an interference claim has never been pled and cannot be raised for the first time in response to its motion for summary judgment. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Edward v. Niles Sales & Serv., Inc.,* 439 F. Supp. 2d 1202, 1224 (S.D. Fla. 2006) (refusing to allow the plaintiff to assert new bases for his race discrimination claim when the new bases were raised for the first time in response to a summary judgment motion). Klein's summary judgment opposition attempts to raise a new FMLA interference claim based on new allegations and new facts, as opposed to merely additional ones, that are not alleged in her complaint. This is a fundamental change in the nature of Klein's FMLA claim that is impermissible at this late stage in the litigation. *See Hurlbert*, 439 F.3d at 1296. "Rule 8(a)'s liberal pleading

---

[18] Not only does Klein's complaint fail to allege any facts or violations concerning FMLA notice provisions, she also never mentions in her deposition that her FMLA interference claim is based on her failure to receive certain FMLA notices. (Doc. #21-1.) Rather, Klein points to her termination, surmising that she was never reinstated to her position following her return from a medical leave of absence and that she would have been had she been notified of and taken statutorily protected FMLA leave. (Doc. #21-1.)

standard is inapplicable once discovery has commenced, and . . . '[a]t the summary judgment stage, the proper procedure for plaintiff[] to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).'" *Id.* at 1296 (quoting *Gilmour*, 382 F.3d at 1315) (alterations to original).  Because Klein failed to do that in this case, the Court will not consider her FMLA interference claim to the extent it is based on Army Fleet's purported failure to comply with the FMLA's notice provisions.

That leaves the Court to analyze Klein's FMLA claim as pled in the complaint.  From her brief in opposition to summary judgment, it appears that Klein is attempting to cast her FMLA claim as one for both interference with, that is, denial, of her FMLA rights and retaliation for exercising those rights.  Regardless of the nomenclature attributed to this claim, however, Klein has failed to meet her burden as to her FMLA claim, as the Court explains below.

### 1.     Interference

Klein's FMLA interference claim is premised on the argument that Army Fleet interfered with her rights under the FMLA by failing to reinstatement her to her position following her return from medical leave on August 27, 2012.  To succeed on an FMLA interference claim, Klein must demonstrate that "[s]he was denied a benefit to which [s]he was entitled under the FMLA." *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1266–67 (11th Cir. 2008) (per curium) (alterations to original).  Klein claims that she has made this showing because she was informed of her termination on the very same day she returned from medical leave, thereby establishing that Army Fleet denied her the benefit of

29

reinstatement to which she was entitled.

First, this argument presumes that Klein exercised some right under the FMLA that would entitle her to the protections the statute affords, which, in this case, is reinstatement. The record is clear that Klein took 12 weeks of non-FMLA medical leave for her back injury—the same amount of leave the FMLA provides—and that she drew short-term disability payments during this time.  Although a plaintiff need not expressly invoke the FMLA, but rather is only required to give the employer enough information for it to realize that she is requesting leave for a serious health condition, at least one district court has recognized that a plaintiff cannot establish a triable issue on a FMLA interference claim when the plaintiff never requested FMLA leave nor took FMLA leave.  *See Edwards v. Dialysis Clinic, Inc.*, 423 F. Supp. 2d 789, 795 (S.D. Ohio 2006).

Second, even assuming that Klein has established a prima facie case of FMLA interference in that she exercised a right under the FMLA and was not reinstated to her position upon her return, her right to reinstatement under the statute is not absolute.  *See O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353–54 (11th Cir. 2000).  "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."  29 C.F.R. § 825.216(a).  For example, "If an employee is laid off during the course of taking FMLA leave . . . the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off . . . ."  *Id.*  In other words, "if an employer can show that it refused to reinstate an employee

for a reason unrelated to FMLA leave, the employer is not liable for failing to reinstate the employee after the employee has taken FMLA leave." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235–36 (11th Cir. 2010).  Here, Army Fleet terminated Klein as part of a legitimate reduction in force.  She was selected for termination as part of that reduction in force based on her being the lowest performer in the Quality Department at the time selections for the reduction in force were made, and Klein has not presented sufficient evidence to challenge the legitimacy of that decision.  Klein points to the fact that her low performance score in 2011, on which her selection for termination was based, scored her against the Quality Auditor/Monitor position when she, in fact, was still a Senior Internal Auditor.  However, while that might be correct, there is no dispute that Klein brought this concern to Olive, who then adjusted her 2011 performance review score significantly upward.  Even after this adjustment, Klein still ranked as the lowest performer when Olive evaluated his employees in the Quality Department for the reduction in force.  In sum, the undisputed evidence shows that Klein's termination had absolutely nothing to do with her taking medical leave, whether that leave was under the FMLA or not.  *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241 (11th Cir. 2010) (noting that crux of the issue in an FMLA interference claim based on failure to reinstate is whether the employer proved to a legal certainty that the plaintiff was not reinstated for reasons unrelated to her FMLA leave, such that she would have not be reinstated even if she had not taken leave); *O'Connor*, 200 F.3d at 1354 (recognizing that termination as part of reduction in force can be a legitimate basis on which an employer can deny the right to FMLA reinstatement);

*Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1157 (7th Cir. 1997) (holding that an employer may terminate an employee on FMLA leave as part of a reduction in force with no obligation to reinstate if the termination is unrelated to the FMLA leave).   Accordingly, summary judgment is due to be GRANTED to Army Fleet on Klein's FMLA interference claim.

### 2.   Retaliation

Klein's FMLA retaliation claim is premised on the argument that Klein was terminated not as part of a legitimate reduction in force, but because she had exercised her rights under the FMLA.   To succeed on her FMLA retaliation claim, Klein must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two.[19]   *Krutzig*, 602 F.3d at 1234. Essentially, Klein must show that she suffered an adverse employment action that was "'motivated by an impermissible retaliatory or discriminatory animus.'" *Schaaf*, 602 F.3d at 1243 (quoting *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001)).   In other words, the relevant issue is "could a jury reasonably find from the

---

[19]   The *Schaaf* Court explained that, in the FMLA context, a "but-for" causation analysis was not appropriate; rather, courts should apply a proximate cause analysis, which requires a plaintiff to establish only that the protected activity and adverse action are not "wholly unrelated."   *See Schaaf*, 602 F.3d at 1242–45.   It is unclear whether this premise will hold true, at least with respect to retaliation claims, in light of the Supreme Court's recent ruling in *University of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. -- (2013), which held that a "but-for" causation analysis is required in the context of Title VII retaliation claims.   That being said, the Court is unaware of any case law extending the holding of *Nassar* to FMLA retaliation claims, and, therefore, it will continue to follow the proximate cause analysis.   *See Clark v. Jackson Hospital & Clinic, Inc.*, 2013 WL 5347450, at *5, n.3 (M.D. Ala. Sept. 23, 2013) (applying the "wholly unrelated"/proximate cause analysis to an FMLA retaliation claim but recognizing the potential implications of *Nassar* and "but for" causation on FMLA retaliation claims).

evidence presented at the summary judgment stage that [Klein] was fired because she [took] FMLA leave?"  *Brungart v. BellSouth Tele., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).

As stated above, the Court finds plausible Army Fleet's argument that Klein cannot establish a prima facie retaliation claim because the undisputed evidence shows that she did not request or take FMLA leave, and, therefore, she did not engage in statutorily protected conduct under the FMLA.  Instead, Klein took 12 weeks of non-FMLA leave for her back injury.  *See Walker v. Elmore Cnty. Bd. of Educ.*, 379 F.3d 1249, 1251–53 (11th Cir. 2004) (holding an employee who was ineligible for FMLA leave could not maintain a retaliation claim because her request for leave was not protected by the FMLA); *Edwards,* 423 F. Supp. 2d at 795.  As Army Fleet notes, it could not retaliate against Klein for taking FMLA leave when she arguably did not engage in statutorily protected conduct.

That being said, and having to take the evidence in the light most favorable to Klein, the Court will assume, without deciding, that Klein has established a prima facie case of retaliation under the FMLA (*i.e.,* that (1) she engaged in statutorily protected activity (she took FMLA leave), (2) she suffered an adverse employment decision (she was terminated), and (3) the decision was causally related to the protected activity (she was notified of her termination the same day she returned from medical leave).[20]  Even then, Klein's retaliation

---

[20]  "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."  *See Brungart*, 231 F.3d at 799; *Clark*, 2013 WL 5347450 at *5 ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. Thus, the Hospital's refusal to return Plaintiff to the PCU immediately upon her return from leave and her termination a month later—regardless of the Hospital's motives— suffice to establish the causal connection for the

claim still fails, as she has failed to raise a triable issue as to whether her termination was "motivated by an impermissible retaliatory or discriminatory animus." *Schaaf*, 602 F.3d at 1243.  Army Fleet articulated a legitimate, non-discriminatory reason for Klein's termination unrelated to her leave—a reduction in force—and, as discussed above, Klein has presented insufficient evidence demonstrating that this reason is nothing more than a pretext for a retaliatory motive. *See Martin*, 543 F.3d at 1268 (applying *McDonnell Douglas* burden-shifting framework to FMLA retaliation claims*)*.  Indeed, Klein did not present any evidence suggesting that Army Fleet was motivated by a discriminatory animus, nor did she present sufficient evidence showing that Army Fleet's reasons for selecting her for the reduction in force (*i.e.*, Klein being the lowest performer in the Quality Department) were not true. Instead, Klein argues that the 2011 performance evaluation on which Olive relied in making his selection for the reduction in force was not fair or an accurate representation of her abilities, but an employee's subjective assessment of her own performance is not sufficient to create a triable issue as to pretext. *See, e.g., Chapman*, 229 F.3d at 1030.  The issue in the pretext analysis is not whether Army Fleet's conclusion was correct, but whether it was honest, and Klein has presented no evidence to refute that.  Therefore, even when drawing all inferences in favor of Klein, the Court concludes that, based on the undisputed evidence, a reasonable jury could not conclude that Klein was included in Army Fleet's reduction in force in retaliation for taking medical leave or otherwise exercising her rights under the

---

purposes of Plaintiff's prima facie case.").

FMLA.  Accordingly, summary judgment is GRANTED to Army Fleet on Klein's FMLA retaliation claim.

## V.  CONCLUSION

Based upon the foregoing, it is hereby ORDERED that Defendants' Motion for Summary Judgment (Doc. #19) is GRANTED, and Klein's claims against L-3 and Army Fleet are hereby DISMISSED WITH PREJUDICE.  It is further ORDERED that the trial scheduled in this case is CANCELLED.

A separate final judgment is forthcoming.

DONE this the 1st day of November, 2013.

_____/s/ Mark E. Fuller_____
UNITED STATES DISTRICT JUDGE
